## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATE SWARTZ, on behalf of himself and all others similarly situated,

                Plaintiff,

        v.

ESPN Inc.,

                Defendant.

Civil Action No. _____

**COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Nate Swartz, on behalf of himself and all others similarly situated, files this Complaint against Defendant ESPN Inc. ("Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA") and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 *et seq.* ("Pennsylvania Wiretap Act"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

### I.     NATURE OF THE ACTION

1.     This is a consumer class action complaint against Defendant as the owner of ESPN.com and the ESPN+ paid streaming service for violating the VPPA and the Pennsylvania Wiretap Act. By deciding to use Facebook's Meta Pixel on its website, Defendant knowingly intercepted Subscribers' ("Subscribers" refers to persons with digital subscriptions to ESPN+ or

ESPN.com) electronic communications without the proper consent. Defendant then disclosed to Facebook the contents of these electronic communications in the form of Subscribers' (i) personally identifiable Facebook ID ("FID") and (ii) the computer file containing the watched video and its corresponding URL (the "uniform resource locator" or web address) ("Video Media"). Together, the FID and Video Media constitute a Subscriber's "Personal Viewing Information."

2.      Defendant serves video content to over 22 million Subscribers to its ESPN+ streaming service throughout the United States. ESPN+ Subscribers can stream live sports and view exclusive video content via the ESPN.com website or the ESPN mobile application ("App") on their mobile devices.

3.      Defendant collects and shares the personal information of visitors to its website and App with third parties. Defendant does this in a number of ways, including using cookies (small blocks of data stored on an internet user's computer to track the user's browsing activity); software development kits, or "SDKs" (sets of software and tools allowing developers to create applications); and pixels (pieces of code installed on website that measure the actions users take on a website).

4.      The Meta Pixel (f/k/a Facebook Pixel) is a code Defendant installed on its website allowing Defendant to track "conversions"—that is, when users take certain actions on its website, such as clicking an ad or viewing content—and to collect users' data. More specifically, the Meta Pixel allows ESPN.com to track when a Subscriber visits the ESPN.com website or App and views Video Media, as well as the Subscriber's FID.

5.      Importantly, without Subscriber consent, Defendant discloses the Subscriber's Personal Viewing Information—i.e., Subscriber's unique FID and video content viewed—*together*

*as one data point to Facebook*. Because the Subscriber's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view a Subscriber's corresponding Facebook profile. Put simply, the Meta Pixel allows Facebook to know what Video Media a Subscriber viewed on the ESPN.com site or App.

6.      By using the Meta Pixel to track Subscribers' activity on its website, Defendant targets advertising and other content on its website. Thus, Defendant profits handsomely from its unauthorized interception and disclosure of Personal Viewing Information to Facebook. It does so at the expense of its Subscribers' privacy and their statutory rights under the VPPA and the Pennsylvania Wiretap Act.

7.      The VPPA prohibits video tape service providers from knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a stand-alone consent form.

8.      The VPPA defines "video tape service provider" as anyone "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." As the owner of ESPN.com and ESPN+, Defendant is engaged in the delivery of such audio visual materials.

9.      Section 5703 Pennsylvania Wiretap Act prohibits: (1) intentional interception, endeavors to intercept, and procurement of any other person to intercept or endeavor to intercept any wire, electronic or oral communication; (2) intentional disclosure or endeavors to disclose the contents of such wire, electronic, or oral communications, knowing or having reason to know that the information was obtained through interception; and (3) the intentional use or endeavors to use the contents of any wire, electronic, or oral communication, knowing or having reason to know

that the information was obtained through interception. Defendant's integration of the Meta Pixel on its website to track Subscribers' Personal Viewing Information constitutes the interception of Subscribers' electronic communications and the disclosure and use of the contents of those electronic communications.

10.     Because Defendant's Subscribers are not informed about this dissemination of their Personal Viewing Information – indeed, it is automatic and *invisible* – they do not consent and cannot exercise reasonable judgment to defend themselves against the highly personal ways Defendant has used and continues to use their data to make money for itself.

11.     Defendant chose to disregard Plaintiff's and *millions* of other Subscribers' statutorily protected privacy rights by releasing their personal data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally intercepting and disclosing its Subscribers' Personal Viewing Information to Facebook in knowing violation of the VPPA and the Pennsylvania Wiretap Act.

## II.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or

emanated from this District.

### III.    PARTIES

12.    Plaintiff Nate Swartz is an adult citizen of Pennsylvania and is domiciled in Hummelstown, Pennsylvania. Plaintiff began his paid digital subscription to ESPN around 2017, first through ESPN Insider and later through ESPN+, and continues to maintain the subscription to this day. Plaintiff has had a Facebook account from approximately 2011 to the present. During the relevant time period, Plaintiff has used his ESPN digital subscription to view Video Media through the ESPN.com website and/or App while logged into his Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information.

13.    Defendant ESPN Inc. is a sports media company organized under the laws of Delaware, with its principal place of business located in Bristol, Connecticut. Defendant owns ESPN, the basic cable sports channel. ESPN.com is the official website of ESPN. The ESPN.com website provides a broad selection of video content. In April 2018, ESPN introduced a subscription-based video-on-demand streaming service called ESPN+. As detailed below, through the ESPN.com website and App, Defendant delivers countless hours of video content to its paid Subscribers.

### IV.    FACTUAL ALLEGATIONS

#### A.  The Video Privacy Protection Act

14.    The VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the

Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorneys' fees.

15.     The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase, and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

16.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audio visual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

18.     While these statements rang true in 1988 when the VPPA was passed, the

importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a 2012 Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

19.     In this case, Defendant chose to deprive Plaintiff and the Class members of that right by systematically disclosing their Personal Viewing Information to Facebook, without providing notice to (let alone obtaining consent from) anyone, as explained herein.

## B. Pennsylvania's Wiretapping and Electronic Surveillance Control Act

20.     The Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 *et seq.* ("Pennsylvania Wiretap Act") offers a civil cause of action to "any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of" the statute, against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S. § 5725(a).

21.     The Pennsylvania Wiretap Act is generally modeled after the Federal Wiretap Act, 18 U.S.C. §§ 2510 *et seq.*, which provides uniform minimum protections for wire, electronic, and oral communications, and which authorizes states to adopt wiretap statutes that provide greater— but not lesser—protection than what is available under federal law.

22.     The principal focus and purpose of the statute is the protection of privacy, and

---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last accessed July 11, 2022).

therefore its provisions must be strictly construed.

23.    Defendant violated the Pennsylvania Wiretap Act by intentionally procuring the Meta Pixel to intercept Plaintiff's electronic communications and by using the content of those communications for its own purposes, such as tracking website usage and advertising.

**C.  ESPN+ Digital Subscriptions**

24.    ESPN operates a website in the United States, ESPN.com, which is accessible from desktop and mobile devices at ESPN.com. It also offers an App available for download on Android and iPhone devices.

25.    ESPN.com visitors who wish to access additional, exclusive content may do so by paying for a subscription to ESPN+, which is Defendant's paid video streaming service. Subscribers can sign up for ESPN+ on ESPN.com or through App stores.

26.    On information and belief, all Subscribers to ESPN+ provide Defendant with their IP (Internet Protocol) address, which is a unique number assigned to any device connected to the internet or a local network, that informs Defendant as to Subscribers' city, zip code and physical location. Subscribers may also provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

27.    When a Subscriber opens an account, Defendant does not disclose that it will share their Personal Viewing Information with third parties, such as Facebook. Subscribers are also not asked to consent to such information sharing upon opening an account.

28.    Subscribers to ESPN+ have access to a variety of ESPN+ Video Media on Defendant's digital platform.

29.    Notably, once a Subscriber signs in and watches ESPN+ Video Media, he or she is not provided with any notification that their Personal Viewing Information is being given to

Facebook. Similarly, Defendant also fails to obtain Subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**D. Defendant Admits It Collects and Discloses Personal Information of Digital Subscribers But Fails to Inform or Obtain Consent from Subscribers**

30.    A Subscriber or any other visitor to ESPN.com must scroll to the very bottom of the home page, passing the equivalent of approximately 7 printed 8.5"x11" pages, to reach a list of 10 inconspicuous hyperlinks, including the Privacy Policy:



31.    A Subscriber or any other visitor clicking on the Privacy Policy hyperlink is taken to the page below:



32.    The Privacy Policy states that Defendant may collect "Activity information about your use, and the use by any person(s) you authorize through your account (for example, through the creation of profiles under your Disney+ or Hulu account), of our sites and applications, such as the content you view or post, how often you use our services, and your preferences."[2]

33.    The Privacy Policy states Defendant "**will not share** your personal information outside The Walt Disney Family of Companies **except in limited circumstances**" such as "**when you allow us to share** your information with another company, **by electing to share** your personal information with **carefully selected companies** so that they can send you offers and promotions about their products and services" and "**when you direct us** to share your personal information with third-party sites or platforms, such as social networking sites."[3]

34.    "Personal information" is defined as "information that identifies (whether directly

---

[2] https://privacy.thewaltdisneycompany.com/en/current-privacy-policy/ (last modified Sept. 22, 2022).
[3] *Id.* (emphases added).

or indirectly) a particular individual, such as the individual's name, postal address, email address, and telephone number. When anonymous information is directly or indirectly associated with personal information, the resulting information also is treated as personal information."[4]

35.     Importantly, nowhere in the ESPN.com Privacy Policy is it disclosed that Defendant will intercept Subscribers' private and protected Personal Viewing Information using the Meta Pixel and share it with Facebook or other third parties. Moreover, while Defendant states it will only share private information with third parties if a Subscriber "elects" or "directs" Defendant to do so, Defendant does not disclose what such an election or direction looks like.

### E. How ESPN.com Intercepts, Discloses, and Uses Digital Subscribers' Personal Viewing Information

#### 1.     *Tracking Pixels*

36.     Websites and apps that choose to use the Meta Pixel are aware that it collects information about user's devices and activities and sends that information to Facebook. Facebook then uses that information to send targeted ads to the user.

37.     The Meta Pixel, also known as a "tag" or "web beacon" among other names, is an *invisible* tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the Meta Pixel, the website advertiser tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

38.     Defendant installed the Meta Pixel, which enables it to intercept and disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefits financially from the advertising and information services that stem from use of the Metal Pixel.

---

[4] *Id.*

When an ESPN+ Subscriber visits the ESPN website, Defendant sends to Facebook certain information about the Subscriber, including, but not limited to, their identity and the media content the Subscriber watched. Specifically, ESPN.com sends to Facebook the video content name, its URL, and, most notably, the Subscriber's Facebook ID.

### 2. *Facebook ID ("FID") and Video Media*

39.    The Facebook ID ("FID") is a unique and persistent identifier that Facebook assigns to each user. As Facebook itself explains, any ordinary person can look up the user's Facebook profile and name using the FID:

**User ID**

Your User ID is a string of numbers that doesn't personally identify you but does connect to your Facebook profile. You have a User ID automatically, whether or not you choose to create a username. Learn how to find your user ID.

User IDs can:

- Allow someone with the ID to see your profile, including any public information. Learn how to adjust what people can see in your profile.

- Help other applications personalize your experience by connecting with your Facebook account. When you allow apps to connect with your Facebook account, they can use your user ID to see public information, like your public profile and your friend list.

- When you run into issues with an app or game, your User ID can help the developer better investigate the problem to understand and address your specific concerns.

40.    When a Facebook user with one or more personally identifiable FID cookies on his or her browser views Video Media from ESPN+ on the website or app, ESPN.com, through its website code, causes the Subscriber's identity and Personal Viewing Information to be transmitted to Facebook by the Subscriber's browser. This transmission is not the Subscriber's decision, but results from Defendant's purposeful use of the Meta Pixel by incorporation of that pixel and code into ESPN.com's website and App.

41.    Defendant could easily program the website and App so that this information is not

automatically transmitted to Facebook when a Subscriber views Video Media. However, it is not in Defendant's financial interest to do so because it benefits financially from using the Meta Pixel. The Meta Pixel allows companies like Defendant to track conversions from Facebook ads (e.g., track who visits ESPN.com by clicking on a Facebook ad), optimize ads, and build targeted audiences for future ads.

42.    Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name, and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the Subscribers—any ordinary person could learn the identity of the Subscriber and the specific video or media content they requested on ESPN.com or the App.

**F. ESPN.com Unlawfully Procures Facebook to Intercept Digital Subscribers' Personal Viewing Information and Discloses it to Facebook**

43.    At all relevant times, Defendant procured Facebook to intercept Subscribers' electronic communications through the incorporation of the Meta Pixel on Defendant's website and its App. At all relevant times, Defendant knowingly disclosed Personal Viewing Information to Facebook through the Meta Pixel. This is evidenced by, among other things, the functionality of the Meta Pixel, including that it enabled Defendant to show targeted advertising to its Subscribers based on the Video Media those Subscribers had previously viewed on the ESPN website or App. Defendant received a financial benefit from the advertising facilitated by the Meta Pixel.

44.    Defendant maintains a vast digital database comprised of its Subscribers' Personal Viewing Information, including the names and e-mail addresses of each Subscriber and information reflecting the Video Media that each of its Subscribers viewed.

45.     Defendant is not sharing anonymized, non-personally identifiable data with Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook— *receives the Personal Viewing Information as one data point*. Defendant has thus monetized its database by disclosing its Subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its Subscribers and to the detriment of their legally protected privacy rights.

46.     Critically, the Personal Viewing Information Defendant intercepts and discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

47.     These factual allegations are corroborated by publicly available evidence. When an ESPN+ Subscriber clicks on an article and watches the video, Defendant sends certain information to Facebook.

48.     For example, as recently as August 2022, when a Subscriber clicked and watched a video titled "Should the Knicks trade for Donovan Mitchell?", Defendant sent that video's title, the URL, and the digital Subscriber's FID (as the cookie "c_user"), along with other data, to Facebook:



49.    The "c_user" cookie, or FID, is a unique identifier of the Facebook user currently

logged onto Facebook on that device. An ordinary person who knows a Facebook user's FID can

easily look up the Facebook user's Facebook profile by entering "www.facebook.com/[insert

FID]".   And anyone who looks up a Facebook profile in this way can view the profile page—

including the person's name used when they registered with Facebook.

50.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's Subscribers, together with additional sensitive personal information.

51.    Defendant does not seek its Subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

52.    By disclosing its Subscribers Personal Viewing Information to Facebook— which undeniably reveals both an individual's identity and the specific video materials they requested from Defendant's website —Defendant has intentionally and knowingly violated the VPPA and Pennsylvania Wiretap Act.

53.    More recently, Defendant has changed the information about Subscribers' viewing history it sends to Facebook. Below is a screenshot from September 2022 showing the data Defendant sent to Facebook when a Subscriber clicked on and watched a video titled "Stephen A. is 'concerned' that Aaron Judge could leave the Yanks for one team." While Defendant still sends Facebook the "c_user" cookie or FID and data about the video, it no longer sends the text of the video title:



### G. Intercepting Electronic Communications and Disclosing Personal Viewing Information is Not Necessary for Defendant's Business.

54.     Tracking pixels are not necessary for Defendant to operate ESPN.com's digital news publications and sign-up digital subscriptions.  They are deployed on Defendant's website and App for the sole purposes of intercepting electronic communications so as to enrich Defendant and Facebook.

55.     Even if an on-line news publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict consent requirements of the VPPA and the Pennsylvania Wiretap Act, which it failed to do.

### H.  Plaintiff's Experiences

56.     Plaintiff Nate Swartz has been a Subscriber of ESPN from around 2017 through the present. Plaintiff initially subscribed to Defendant's then-existing subscription service, ESPN Insider, by providing, among other information, his name, address, email address, IP address

(which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Sometime around 2018, ESPN Insider was discontinued and integrated into ESPN+. As part of his subscription, Plaintiff receives emails and other news from Defendant.

57.     Plaintiff initially subscribed to and paid ESPN directly. Some time in or around 2020, Plaintiff began accessing and paying for his ESPN+ subscription through his Verizon internet plan.

58.     From approximately 2017 to the present, Plaintiff viewed Video Media via both ESPN.com's website, the App installed on his iPhone, and by streaming through an internet-connected TV.

59.     Plaintiff has had a Facebook account since approximately 2011 through the present. He accesses his Facebook account via the Facebook App on his iPhone.

60.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to intercept his electronic communications or disclose his Personal Viewing Information to Facebook. Plaintiff did not provide his informed written consent to such disclosures in a form distinct and separate from any form setting forth his other legal obligations. Defendant did not provide a clear and conspicuous opportunity for Plaintiff to withdraw from or opt out of these disclosures.

61.     Contrary to Defendant's Privacy Policy's prerequisites for sharing Plaintiff's personal information with third parties, Plaintiff never allowed, elected, or directed Defendant to share his Personal Viewing Information with Facebook. Nevertheless, Defendant knowingly did so.

62.     Because Plaintiff is entitled by law to privacy in his Personal Viewing Information,

Defendant's disclosure of his Personal Viewing Information deprived Plaintiff of the full set of benefits to which he was entitled as part of being an ESPN+ Subscriber.

## V.   CLASS ACTION ALLEGATIONS

63.    Plaintiff brings a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated (the "Nationwide Class"):

> All persons in the United States with digital subscriptions to ESPN+ or ESPN.com who viewed Video Media on Defendant's website or App and used Facebook during the time the Meta Pixel was active on Defendant's website or App.

64.    Plaintiff brings a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated (the "Pennsylvania Subclass"):

> All persons in Pennsylvania with digital subscriptions to ESPN+ or ESPN.com who viewed Video Media on Defendant's website or App and used Facebook during the time the Meta Pixel was active on Defendant's website or App.

65.    Excluded from the Nationwide Class and the Pennsylvania Subclass (the "Classes") are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

66.    <u>Numerosity</u>. Members of the Classes are so numerous and geographically dispersed that joinder of all members of the Classes is impracticable. Plaintiff believes that there are potentially millions of members of the Nationwide Class widely dispersed throughout the United States and tens of thousands of members of the Pennsylvania Subclass. Class members can be identified from Defendant's records and non-party Facebook's records.

67.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Classes. Plaintiff and members of the Classes were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. His claims are based on the same legal theories as the claims of other Class members.

68.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

69.    <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Questions of law and fact common to the Classes include:

(a)    Whether Defendant knowingly disclosed Nationwide Class members' Personal Viewing Information to Facebook;

(b)    Whether the information disclosed to Facebook concerning Nationwide Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)    Whether Defendant's disclosure of Nationwide Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)    Whether Nationwide Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B);

(e)     Whether Defendant intentionally intercepted or procured another person to intercept Pennsylvania Subclass members' electronic communications in violation of the Pennsylvania Wiretap Act;

(f)     Whether Defendant intentionally disclosed the contents of Pennsylvania Subclass members' electronic communications;

(g)     Whether Defendant intentionally used the contents of Pennsylvania Subclass members' electronic communications; and

(h)     Whether the Class is entitled to damages and other relief as a result of Defendant's conduct.

70.     <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

VI.    **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of the Video Privacy Protection Act ("VPPA"),**
**18 U.S.C. § 2710**
**(on behalf of the Nationwide Class)**

71.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein and brings this claim individually and on behalf of the Nationwide Class.

72.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

73.    As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

74.    Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

75.    As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

76.    Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed ESPN+ Video Media, including the specific video materials requested from the website.

77.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to ESPN+ which provides Video Media content to the Subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

78.     As set forth in 18 U.S.C. §2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

79.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

80.     Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the Subscribers' FID.

81.     By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

82.     As a result of the above violations, Defendant is liable to the Plaintiff and other

Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

### SECOND CLAIM FOR RELIEF
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 *et seq.*
(on behalf of the Pennsylvania Subclass)**

83.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein and brings this claim individually and on behalf of the Pennsylvania Subclass.

84.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5703 (the "Pennsylvania Wiretap Act") prohibits the (1) intentional interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.

85.    By visiting Defendant's website and viewing videos, Plaintiff and Class members engaged in electronic communications with Defendant.

86.    Plaintiff and Pennsylvania Subclass members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

87.    Plaintiff and Pennsylvania Subclass members did not consent to having their electronic communications with Defendant intercepted by Facebook.

88.    Defendant procured Facebook to automatically and surreptitiously intercept Plaintiff's and Pennsylvania Subclass members' electronic communications in real-time by installing the Meta Pixel on its website.

89.    Defendant intentionally disclosed to Facebook the contents of Plaintiff's and Pennsylvania Subclass members' electronic communications in the form of their viewing histories and FIDs, and had reason to know that this information was obtained through its interception of such electronic communications.

90.    Upon information and belief, Defendant intentionally used Plaintiff's and Pennsylvania Subclass members' intercepted electronic communications obtained via the Meta Pixel to track Subscribers' activity on Defendant's website.

91.    Upon information and belief, Defendant knew that Facebook would add Plaintiff's and Pennsylvania Subclass members' viewing histories and FIDs to Facebook's own back-end database for advertising, research, product development, and other purposes.

92.    Under § 5725(a), any person whose wire, electronic, or oral communication is intercepted or disclosed in violation of the Pennsylvania Wiretap Act may bring a civil action against any person who intercepts, discloses, or uses, or procures another person to do so.

93.    As a result of the above violations, Defendant is liable to Plaintiff and the Pennsylvania Subclass for (1) actual damages, not less than liquated damages computed at the rate of $100/day for each violation, or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorney's fees and other litigation costs.

## VII.    RELIEF REQUESTED

94.    Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court enter an order:

(a)    Certifying this action as a class action pursuant to Rules 23(a), (b)(2), and

(b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Nationwide Class and Pennsylvania Subclass;

(b)     Declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)     Declaring that Defendant's conduct as described herein violates the Pennsylvania Wiretap Act, 18 Pa. C.S. § 5710 *et seq.*;

(d)     Requiring Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(e)     Requiring Defendant to pay damages of $100 a day for each day of violation, or $1,000 to Plaintiff and each Pennsylvania Subclass member, as provided by the Pennsylvania Wiretap Act, 18 Pa. C.S. § 5725(a);

(f)     Awarding punitive damages, as warranted, in an amount to be determined at trial,

(g)     Awarding prejudgment interest on all amounts awarded;

(h)     Awarding restitution and all other forms of equitable monetary relief;

(i)     Issuing injunctive relief as pleaded or as the Court may deem proper; and

(j)     Awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## VIII.   JURY DEMAND

95.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of

himself and the proposed Class, demands a trial by jury on all issues so triable.


Date: September 29, 2022                         Respectfully submitted,

                                                 */s/ John A. Macoretta*
                                                 John A. Macoretta (PA 60094)
                                                 Jeffrey L. Kodroff (PA 55780)
                                                 Diana J. Zinser (PA 203449)
                                                 **SPECTOR ROSEMAN AND KODROFF, P.C.**
                                                 2001 Market Street, Suite 3420
                                                 Philadelphia, PA 19103
                                                 Phone: (215) 496-0300
                                                 Fax: (215) 496-6611
                                                 jmacoretta@srkattorneys.com
                                                 jkodroff@srkattorneys.com
                                                 dzinser@srkattorneys.com

                                                 *Attorneys for Plaintiff and the Proposed Class*