**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NATE SWARTZ, | |
| Plaintiff, | CIVIL ACTION NO. 1:22-CV-01523 |
| v. | (MEHALCHICK, J.) |
| ESPN INC., | |
| Defendant. | |

**MEMORANDUM**

Plaintiff Nate Swartz ("Swartz") initiated this action by filing a complaint on September 29, 2022, against Defendant ESPN Inc. ("ESPN"). (Doc. 1). Before the Court is ESPN's renewed motion to compel arbitration and stay this action. (Doc. 43). For the reasons provided herein, ESPN's motion will be granted.

**I.   BACKGROUND AND PROCEDURAL HISTORY**

The following factual background comes from the parties' statements of material fact and accompanying exhibits. (Doc. 45; Doc. 47). ESPN offers a subscription service called ESPN+ which provides subscribers with access to exclusive ESPN articles and streaming content. (Doc. 45, ¶ 2; Doc. 47, ¶ 2). ESPN+ is offered as an affiliate of Disney Streaming and is included in a subscription package called the Disney Bundle, which also includes access to Hulu and Disney+. (Doc. 45, ¶¶ 3, 10; Doc. 45, ¶¶ 3, 10). On January 3, 2021, Swartz enrolled in and activated a Disney Bundle subscription through a Verizon promotion. (Doc. 45, ¶¶ 7, 8, Doc. 45-3, ¶ 10; Doc. 47, ¶ 8).

To enroll in the Verizon Disney Bundle promotional subscription, customers are directed to the Disney Bundle webpage from Verizon's website. (Doc. 45, ¶ 11; Doc. 45-3, at

6; Doc. 47, ¶ 11). After responding to inquiries on several webpages, customers are eventually guided to an activation page. (Doc. 45, ¶ 12; Doc. 45-3, at 7-8, 26; Doc. 47, ¶ 12). On the activation page, customers must enter their email address and press a large button that states "AGREE & CONTINUE." (Doc. 45, ¶ 12; Doc. 47, ¶ 12). Immediately above the "AGREE & CONTINUE" button are four sentences of text stating terms to which, according to ESPN, customers must acknowledge and agree before completing their Disney Bundle subscription activation ("Activation Acknowledgment"). (Doc. 45, ¶ 13; Doc. 45-3, at 8). Relevant here, the Activation Acknowledgement states: "By clicking 'Agree & Continue,' you agree to our Subscriber Agreement and acknowledge that you have read our Privacy Policy." (Doc. 45, ¶ 13; Doc. 45-3, at 8, 26). The Subscriber Agreement and Private Policy are hyperlinked in blue, and the rest of the text is light gray. (Doc. 45, ¶ 13; Doc. 45-3, at 26). In the Subscriber Agreement, there is a Binding Arbitration and Class Action Waiver provision ("Arbitration Provision"). (Doc. 45, ¶ 17; Doc. 45-3, at 31; Doc. 45, ¶ 17). The parties do not dispute the terms of this provision, but rather, they dispute whether Swartz had notice of and assented to the Subscription Agreement. (Doc. 45, ¶¶ 17-18; Doc. 45-3, at 41-42; Doc. 47, ¶¶ 17-18). Swartz maintains that he "was not required to read or even view the Subscriber Agreement before proceeding in the subscription process and does not recall doing so." (Doc. 47, ¶ 14; Doc. 47-2).

On September 28, 2022, Swartz received an email regarding updates to the Subscriber Agreement, effective November 3, 2022 ("2022 Update Email"). (Doc. 45, ¶ 23; Doc. 47, ¶ 23). The 2022 Update Email highlighted updates to the Subscriber Agreement, including the Arbitration Provision. (Doc. 45, ¶ 23; Doc. 47, ¶ 23). The day after Swartz received this email, on September 29, 2022, he filed a complaint against ESPN alleging violations of the Video

Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA") and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 et seq. ("Pennsylvania Wiretap Act"). (Doc. 1).

On November 28, 2022, ESPN moved to compel arbitration and stay this action. (Doc. 10). According to ESPN, Swartz assented to the Subscriber Agreement, which contained a binding arbitration and class action waiver provision that covered "all disputes" between Swartz, ESPN, the Walt Disney Company ("Disney"), and Disney's affiliates. (Doc. 10). Swartz continues to pay monthly subscription fees associated with his Disney Bundle account even after ESPN filed its first motion to compel. (Doc. 45, ¶ 26; Doc. 45-8, at 47; Doc. 47, ¶ 26). On July 10, 2023, the Court denied ESPN's motion without prejudice pending discovery on the issue of arbitration. (Doc. 29). On February 9, 2024, ESPN filed a renewed motion to compel arbitration and stay this action, as well as a statement of facts, exhibits, and a brief in support. (Doc. 43; Doc. 44; Doc. 45). On March 1, 2024, Swartz filed a brief in opposition, a statement of facts, and exhibits. (Doc. 46; Doc. 47). On March 15, 2024, ESPN filed a reply brief. (Doc. 48). On March 22, 2024, Swartz requested oral argument on the issue of arbitration. (Doc. 49). The Court held oral arguments on April 22, 2024. (Doc. 50). On May 20, 2024, the Court stayed this action pending the Pennsylvania Supreme Court's resolution of *Chilutti v. Uber Technologies Inc.* (Doc. 54). The Court now lifts this stay. Accordingly, this matter is ripe and ready for disposition.

## II.    LEGAL STANDARDS

### A.  MOTION TO COMPEL ARBITRATION

"It is well established that the Federal Arbitration Act (FAA), reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Kirleis v. Dickie, McCamey &*

*Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). However, "the cardinal principle of the law of arbitration is that 'under the [Federal Arbitration Act, arbitration] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.'" *Gay v. CreditInform*, 511 F.3d 369, 388-89 (3d Cir. 2007) (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). The Federal Arbitration Act (the "FAA") provides that "[a] written provision in any. . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity. . ." 9 U.S.C. § 2. The Supreme Court has interpreted the FAA to require courts to "rigorously enforce arbitration agreements according to their terms, including terms that 'specify with whom the parties choose to arbitrate their disputes,' and 'the rules under which that arbitration will be conducted.'" *Am. Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) (internal citations omitted); *see MacDonald v. CashCall, Inc*, 883 F.3d 220, 226 (3d Cir. 2018). "Federal law determines whether an issue governed by the FAA is referable to arbitration." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999). "Questions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law." *Harris*, 183 F.3d at 179; *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) (stating "[the FAA] creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate"). Section 2 of the FAA sets forth the basic rule of federal law:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part

4

thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

Nevertheless, notwithstanding the supremacy of federal law, courts look to ordinary state law principles of contract formation to make this determination. *See Alexander*, 341 F.3d at 264; *see also Gay,* 511 F.3d at 388.

To compel arbitration, a court must determine (1) the validity of the arbitration agreement and (2) whether the dispute falls within the scope of that agreement. *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *see also Bey v. Citi Health Card*, Civ. Action No. 15-6533, 2017 WL 2880581, at *4–5 (E.D. Pa. July 6, 2017). Under the Supreme Court's longstanding severability rule, "a party cannot avoid arbitration by attacking the contract containing the arbitration clause as a whole (the 'container contract'). Rather, the party opposing arbitration must challenge 'the arbitration clause itself.'" *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)). When "[a]pplying the relevant state contract law, a court may also hold that an agreement to arbitrate is 'unenforceable based on a generally applicable contractual defense, such as unconscionability.'" *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004) (quoting *Alexander*, 341 F.3d at 264); *see Gay*, 511 F.3d at 388 ("[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]" (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, (1996)).

"The Third Circuit has established a two-tiered framework for assessing motions to compel arbitration." *Lloyd v. Retail Equation, Inc.*, No. CV 21-17057, 2022 WL 18024204, at

*4 (D.N.J. Dec. 29, 2022) (citing to *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013)). First, "when it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti*, 716 F.3d at 776 (citations and internal quotations omitted); *see Lepore v. SelectQuote Ins. Servs., Inc.*, No. 22-3390, 2023 WL 8469761, at *2 (3d Cir. Dec. 7, 2023). "But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." *Guidotti*, 716 F.3d at 776 (quotation marks omitted). "To proceed otherwise would plainly disadvantage moving parties because they would be limited to the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents relied upon by the complaint, even when non-moving parties introduced and relied on other evidence in opposition." *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 330 (3d Cir. 2022). After this, the Court may entertain a renewed motion to compel arbitration, this time judging the motion under the summary judgment standard of Rule 56.[1] *Guidotti*, 716 F.3d at 776. In the event that summary judgment is not

---

[1] Several courts within this district have denied motions to compel arbitration and ordered limited discovery where the issue of arbitrability was not apparent on the face of the complaint, properly applying *Guidotti*. *See, e.g.*, *Reaser v. Credit One Financial*, No. 3:15-CV-1765, 2016 WL 245541, at *3 (M.D. Pa. Jan. 21, 2016); *Potts v. Credit One Financial*, No. 3:15-CV-1119, 2016 WL 225678, at *5 (M.D. Pa. Jan. 19, 2016) (allowing sixty (60) day limited discovery on the issue of arbitrability); *Rajput v. Credit One Financial*, No. 1:15-cv-00807, 2015

warranted because "the party opposing arbitration can demonstrate, by means of citations to the record," that there is "a genuine dispute as to the enforceability of the arbitration clause," the "court may then proceed summarily to a trial regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions." *Somerset Consulting, LLC v. United Cap. Lenders, LLC,* 832 F. Supp. 2d 474 (E.D. Pa. 2011) (quoting 9 U.S.C. §4).

B.   MOTION FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the

WL 8012938, at *3 (M.D. Pa. Dec. 12, 2015); *Briggs v. Macy's Inc.*, No. CV 3:16-0902, 2017 WL 590274, at *1 (M.D. Pa. Feb. 14, 2017).

nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389

8

n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony. . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").

## III.    DISCUSSION

The parties dispute which state's contract law applies to the formation of the Arbitration Provision, whether the Arbitration Provision is valid, and whether this dispute falls within the scope of the Arbitration Provision. (Doc. 44; Doc. 46). The Court will begin by assessing choice of law. Then, the Court will determine whether the Arbitration Provision is valid before turning to whether the dispute falls within the scope of the Arbitration Provision.

### A.    THERE IS NO ACTUAL CONFLICT OF LAW IN THIS CASE.

ESPN avers that New York law applies to this dispute because the Subscription Agreement has a choice of law provision stating that New York law applies to all disputes between Disney Bundle Subscribers, Disney, and ESPN. (Doc. 44, at 15; Doc. 48, at 8). However, ESPN also argues that that the Court need not resolve which state's law applies because both New York and Pennsylvania law demand the same outcome. (Doc. 44, at 15; Doc. 48, at 8). Swartz counters that Pennsylvania law applies to this dispute and requires the Court to deny ESPN's motion to compel arbitration. (Doc. 46, at 9-11).

A "federal court in the exercise of diversity jurisdiction must apply the same choice-of-law rules that [the forum state's] state courts would apply if they were deciding the case." *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990). In matters of contract, the forum state

applies its own law unless the contract has a choice of law provision. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020). Under Pennsylvania choice of law principles, "[i]f there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006); *see also Hine v. LendingClub Corp.*, No. 2:22-CV-00362, 2023 WL 8113234, at *7 n.3 (W.D. Pa. Nov. 22, 2023). However, when there is a choice-of-law dispute regarding an issue where the relevant state laws differ, there is an actual conflict of law, and the Court must apply Pennsylvania choice-of-law doctrine to determine which state's laws govern the controversy. *See Huber*, 469 F.3d at 74.

Here, the parties dispute whether there is an actual conflict of law. (Doc. 44, at 15; Doc. 46, at 9-11; Doc. 48, at 8). According to ESPN, New York law and Pennsylvania law require the same result, so there is no actual conflict. (Doc. 44, at 15; Doc. 48, at 8). Swartz avers that there is a conflict of law because the Arbitration Provision is not permissible under the Superior Court of Pennsylvania's decision in *Chilutti v. Uber Technologies, Inc*. which establishes a higher standard for the formation of arbitration agreements than other agreements under Pennsylvania law. (Doc. 46, at 9-12). ESPN counters that the Court should disregard *Chilutti* because it is not binding precedent and is preempted by federal law. (Doc. 48, at 8). The Court previously stayed this matter pending the outcome of the Pennsylvania Supreme Court's review of *Chilutti*. (Doc. 54).

On July 19, 2023, the Superior Court of Pennsylvania decided *Chilutti v. Uber Technologies Inc.*, 300 A.3d 430, 449-50 (Pa. Super. 2023). Sitting *en banc*, the *Chilutti* Court reversed the Philadelphia County Court of Common Pleas' grant of a motion to compel arbitration, finding Uber's website and smartphone application failed to provide reasonably

conspicuous notice of its terms and that the plaintiffs did not unambiguously manifest intent to be bound by the company's terms and conditions. 300 A.3d at 435. Appealing heavily to litigants' right to a jury trial, the Superior Court declined to adopt a multi-factor test addressing similar agreements contained in "browsewrap" agreements that was set out by the Ninth Circuit in *Berman v. Freedom Fin. Network, LLC* and adopted by courts in this circuit. *Chilutti*, 300 A.3d at 430; *see e.g., Wiggins v. Lab'y Corp. of Am. Holdings*, No. CV 24-0648, 2024 WL 4476646, at *8 (E.D. Pa. Oct. 11, 2024) (applying *Berman* multifactor test to establish mutual assent to browsewrap agreements); *Hine*, 2023 WL 8113234, at *7 (finding that hyperlinked terms and conditions put user on reasonable notice under *Berman*). The *Chilutti* court found that browsewrap arbitration agreements should be held to a higher standard than other agreements "because the constitutional right to a jury trial should be afforded the greatest protection under the courts of this Commonwealth." 300 A.3d at 449-50. On January 21, 2026, the Pennsylvania Supreme Court reversed the Superior Court in *Chilutti* on jurisdictional grounds, but did not address the merits of the decision. *Chilutti v. Uber Techs., Inc.*, 349 A.3d 826, 834 (Pa. 2026). Rather, the court found that the Superior Court did not have jurisdiction under Pennsylvania law to review an interlocutory order staying litigation pending arbitration. *Chilutti*, 349 A.3d at 834.

The Court is not bound by the Superior Court's *Chilutti* decision both because decisions of the Superior Court of Pennsylvania are not binding authority and because the decision was reversed by the Pennsylvania Supreme Court. *See Transguard Inc. Co. of Am. Inc. v. Hinchey*, 464 F. Supp. 2d 425, 432 (M.D. Pa. 2006) (noting that Pennsylvania federal courts do not need to recognize decisions of the Pennsylvania Superior Court as binding authority); *see also Royal Indem. Co. v. Petrozzino*, 598 F.2d 816, 819 (3d Cir. 1979) (stating "a federal court

in a diversity action is not bound to follow a decision of an intermediate state appellate court when the state's highest court has reversed that decision"). The Court further declines to follow the Superior Court's *Chilutti* decision even as persuasive authority because it contradicts binding authority and is preempted by the FAA. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 187 (2019) (finding courts may not rely on state law where it is "'inconsistent with the FAA'") (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011)).

The Supreme Court has routinely held that state law is preempted when it is an obstacle to the objectives of the FAA. *See Lamps Plus*, 587 U.S. at 189 (noting the "long line of cases holding that the FAA provides the default rule for resolving certain ambiguities in arbitration agreements"). The FAA preempts any state law that treats arbitration provisions differently than any other contract provision. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (noting that the FAA "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms" (internal citation omitted)); *see also Dieffenbach v. Upgrade, Inc.*, 2025., No. 4:23CV1427, 2025 WL 1239328, at *5 (MD. Pa. Apr. 29, 2025) (noting the same). "It is well established that the [FAA] reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Kirleis*, 560 F.3d at 160 (quoting *Alexander*, 341 F.3d at 263). The FAA states that a "written provision in any contract evidencing a transaction involving commerce to settle any arbitration or controversy thereafter arising out of such a contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Further, the Supremacy Clause states that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. CONST., Art. VI, cl. 2. As such, federal law may preempt or otherwise invalidate state law that contradicts federal law.

Consequently, the FAA preempts the Superior Court's heightened standard for browsewrap arbitration agreements because it holds certain arbitration agreements to a higher standard than other agreements. *See Rent-A-Ctr., W., Inc.*, 561 U.S. at 67 (noting that the FAA prevents arbitration agreements from being held to a different standard than other agreements); *see also Doctor's Assocs.*, 517 U.S. at 683, 687 (1996) (finding that the FAA does not recognize special notice requirements when determining the contract's enforceability); *see also Lamps Plus*, 587 U.S. at 177 (finding a rule based on public policy considerations to be "flatly inconsistent with 'the foundational FAA principle that arbitration is a matter of consent'") (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)).

Because the Court may not apply the Superior Court's *Chilutti* rule, the Court finds "there is no substantive difference between New York and Pennsylvania law concerning what is required as far as contract formation and whether a binding agreement to arbitrate exists." *Glavin v. JPMorgan Chase Bank, N.A.*, No. CV 23-1708, 2024 WL 1536739, at *2 (E.D. Pa. Apr. 9, 2024) (citations and internal citations omitted); *compare Kirleis*, 560 F.3d at 160 (stating "[u]nder Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration"); *with Artists Rts. Enf't Corp. v. Est. of King*, 370 F. Supp. 3d 371, 380 (S.D.N.Y. 2019) (stating "[t]o form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound" and "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (citations and internal citations omitted)). Accordingly, no conflict exists, and the Court "may refer interchangeably to the laws of the

13

states whose laws potentially apply." *Huber,* 469 F.3d at 74; *see also Hine,* 2023 WL 8113234, at *7 n.3.

B.  THE PARTIES ENTERED INTO A VALID AGREEMENT.

ESPN avers that Swartz entered into a valid and enforceable arbitration agreement with ESPN when he "assented to the Subscriber Agreement when enrolling in and activating his Disney Bundle subscription on January 3, 2021." (Doc. 44, at 18). Swartz counters "the features of [ESPN's] activation acknowledgement page are an impermissible browsewrap [which does not form a valid contract] and easily distinguishable from clickwrap agreements [which can form a valid contract]." (Doc. 46, at 12).

A "clickwrap" agreement is one that "appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (citation omitted); *see also Delaware River Waterfront Corp. v. Wellspring Software, Inc.,* No. CV 22-1905, 2022 WL 17869139 (E.D. Pa. Dec. 22, 2022) (stating "[a] clickwrap agreement 'presents users with a message on his or her computer screen, requiring the user to manifest his or her assent to the terms of the . . . agreement by clicking on an icon.'" (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002))); *see also Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 117 n5 (3d Cir. 2017). "Courts have also recognized a 'modified clickwrap' agreement, where terms of use are presented as part of some other transaction, such that completing the transaction also accepts the terms of use." *Dobbs v. Health IQ Ins. Servs.*, No. 21-cv-5276, 2022 WL 2974713, at *4, *8 (E.D. Pa. July 27, 2022). Courts in this circuit have found clickwrap agreements enforceable after applying traditional principles of contract law. *See, e.g., HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp.

14

3d 308, 330-31 (W.D. Pa. 2020); *Defillipis v. Dell Fin. Servs.*, No. 3:14-CV-00115, 2014 WL 4198015, at *6 (M.D. Pa. Aug. 22, 2014); *Dobbs*, 2022 WL 2974713, at *4, *8 (finding "'clickwrap' agreements manifest sufficient agreement to the terms in the contract"). However, enforcing a clickwrap agreement does not require showing a "true and actual meeting of the minds." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). Further, "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (citation omitted); *see Hine*, 2023 WL 8113234, at *6. Still, as agreements to arbitrate are matters of contract, a valid arbitration provision contained in a clickwrap agreement nonetheless requires mutual assent. *Dobbs*, 2022 WL 2974713, at *3.

Unlike clickwrap agreements, "'where users must click on an acceptance after being presented with terms and conditions . . . browsewrap agreements do not require users to expressly manifest assent.'" *HealthplanCRM, LLC*, 458 F. Supp. 3d at 331 (quoting *James v. Glob. TelLink Corp*, 852 F.3d 262, 267 (3d Cir. 2017)). In a browsewrap agreement, "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Accordingly, "browsewrap agreements are not automatically deemed valid where it is not shown that the user had *actual* notice of the agreement." *See Lloyd*, 2022 WL 18024204, at *5 (emphasis in original). As acknowledged by the Third Circuit, "[t]here is an evolving body of caselaw regarding whether the terms and conditions in browsewrap agreements are enforceable, often turning on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage." *James*, 852 F.3d at 267. Courts are more hesitant to enforce browsewrap agreements than clickwrap agreements

15

because customers are often unaware of a browsewrap agreement or the fact that continued use of a website "will be deemed to manifest acceptance to [a browsewrap agreement's] terms." *Berman*, 30 F.4th at 856. When determining assent in the context of a browsewrap agreement, courts are thus tasked with analyzing features of the web-based contract, including the design, colors, "textual notice," and features of the relevant interface. *See Lloyd*, 2022 WL 18024204, at *5.

All this considered, "when reviewing these routine internet transactions, 'the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of the merchant's terms of service agreement.'" *Pricharda v. Checkr, Inc.*, No. 5:22-CV-3180, 2022 WL 16749033, at *3 (E.D. Pa. Nov. 7, 2022) (quoting *Dobbs,* 2022 WL 2974713, at *3). A user has notice where the terms of service are conspicuous and presented in a way that a "reasonably prudent internet user" would notice them. *Checchia v. SoLo Funds, Inc.*, 771 F. Supp. 3d 594, 611 (E.D. Pa. 2025). "[W]hile it is permissible to disclose terms and conditions in a hyperlink, the fact that a hyperlink is present must be readily apparent," which is often indicated by the hyperlink being blue, "the color typically used to signify the presence of a hyperlink." *Berman*, 30 F.4th at 854, 856; *see Checchia*, 771 F. Supp. 3d at 609 (noting that hyperlinks are typically signified by blue, underlined text). Additionally, courts have looked to the proximity of the hyperlink to the assent button and whether the website design distracts from notice of the agreement. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292 (2d Cir. 2019); *see also Berman*, 30 F.4th at 857*; see also Wiggins*, 2024 WL 4476646, at *7 (noting that a party is not on notice where the terms of service are difficult to find). Courts must finally ascertain whether the notice "explicitly notif[ies] a user of the legal significance of the action she must take to enter into a contractual agreement." *Berman*, 30 F.4th at 858. To do this, the agreement

must "indicate to the user what action would constitute assent to [the relevant] terms and conditions." *Berman*, 30 F.4th at 858; *see Lloyd*, 2022 WL 18024204, at *5 (noting that a "click can suffice to signify the acceptance of a contract . . . as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement" (citations and internal quotations omitted)). A webpage may do this by including language such as "'By clicking the Continue >> button, you agree to the Terms & Condition.'" *Berman*, 30 F.4th at 858 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017)); *see also Coulter v. Experian Info. Sols., Inc.*, No. CV 20-1814, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021) (finding the language "[b]y clicking 'Submit Secure Order': [the user] accept[s] and agree[s] to [the website's] Terms of Use Agreement" sufficient to put the user on notice the legal significance of clicking a button); *see also Childs v. Fitness Int'l LLC*, No. 2:22-CV-05196, 2023 WL 3594180, at *3 (E.D. Pa. May 22, 2023) (finding an online agreement unenforceable where it failed to state what action constituted assent).

Here, Swartz canceled his ESPN+ subscription on November 3, 2020, and enrolled in the Disney Bundle through a Verizon promotion on January 8, 2021.[2] (Doc. 45, ¶ 8; Doc. 45-7, at 3, Doc. 47, ¶ 8). To enroll, Swartz was required to click a button which included the text "[g]et it now" on a webpage explaining the Disney Bundle. (Doc. 45, ¶¶ 10-11; Doc. 45-3, at

---

[2] The parties agree that Swartz canceled his ESPN+ subscription in November 2020 and resubscribed through a Verizon promotion for the Disney Bundle in January 2021. (Doc. 45, ¶¶ 6, 8; Doc. 47, ¶¶ 6, 8). The parties dispute whether Swartz lost access to ESPN+ from December 1, 2020, to January 3, 2021. (Doc. 45, ¶ 7; Doc. 47, ¶ 7). This dispute is inconsequential. Swartz does not argue that he did not obtain anything of value when he resubscribed to ESPN+ through the Verizon promotion and the Verizon promotion states that by enrolling in the Disney Bundle through the promotion, users obtain access to Disney+, Hulu, and ESPN+ at a discounted subscription price. (Doc. 45-3, at 15; Doc. 46)

21; Doc. 47, ¶¶ 10-11). After pressing "[g]et it now," Swartz was directed to the below webpage:



(Doc. 45, ¶¶ 12-13; Doc. 45-3, at 26; Doc. 45, ¶¶ 12-13).

The blue text on the webpage contains hyperlinks to Disney's Privacy Policy and Subscriber Agreement. (Doc. 45-3, at 26). The hyperlinks are readily apparent and conspicuous on the webpage because they are included in blue text and underlined. (Doc. 45-3, at 26); *see Checchia*, 771 F. Supp. 3d at 609 (noting that hyperlinks are readily apparent and conspicuous when the text is in a different color); *see Berman*, 30 F.4th at 854, 856 (noting the same); *see also Dobbs*, 2022 WL 2974713, at *4 (finding a hyperlink to terms of service

18

conspicuous and apparent where "the letters were purposely and conspicuously set off from the remaining text in a blue, underlined font"). The relevant language pertaining to agreeing to the Subscription Agreement and Privacy Policy is highlighted in a separate box, and the text is not abnormally small. (Doc. 45-3, at 26). There are also no notable distractions on the webpage. (Doc. 45-3, at 26). The text of the webpage also clearly states "[b]y clicking 'Agree & Continue' you agree to our Subscriber Agreement and acknowledge that you have read our Privacy Policy." (Doc. 45-3, at 26). This language notifies the user of the legal significance of clicking "Agree & Continue" because it notifies users "what action [constitutes] assent to" the Subscriber Agreement and Privacy Policy. *Berman*, 30 F.4th at 858; *see Lloyd*, 2022 WL 18024204, at *5. The user must also click "Agree & Continue" to continue and finish creating their Disney Bundle account. (Doc. 45-3, at 26). Because of this, "a reasonably prudent [smartphone, tablet, or computer] user would understand that the [Subscriber Agreement was] connected to the creation of a [Disney Bundle] account." *Meyer*, 868 F.3d at 78; *see Checchia*, 771 F. Supp. 3d at 612.

Swartz argues that he needed to click through five different screens to get to the "Agree & Continue" page; however, this does not change the fact that the relevant webpage where users agree to Disney's Subscriber Agreement notifies users that they are agreeing to the Subscriber Agreement hyperlinked in the text. (Doc. 45-3, at 26). The fact that Swartz may have been clicking through webpages without reading them does not invalidate the agreement. *See Feldman*, 513 F. Supp. 2d at 236 (stating "[a]bsent a showing of fraud, failure to read an enforceable clickwrap agreement, as with any binding contract, will not excuse compliance with its terms"); *see also Keller v. Pfizer, Inc.*, No. 1:17-CV-1883, 2018 WL 5841865, at *4 (M.D. Pa. Nov. 8, 2018) (finding an arbitration agreement enforceable regardless of whether the

plaintiff read the agreement or could remember the terms). Thus, the Court determines that there is no genuine dispute of material fact regarding whether the parties entered into an enforceable arbitration agreement.[3] The Court will turn to whether the parties' dispute is within the scope of the Arbitration Provision.

C. THE ARBITRATOR MUST DETERMINE WHETHER THE DISPUTE FALLS WITHIN THE SCOPE OF THE ARBITRATION PROVISION.

ESPN avers that under the Arbitration Provision, the arbitrator has exclusive authority to determine whether this dispute falls within the scope of the Arbitration Provision. (Doc. 44, at 27-28). Swartz does not respond to this argument. (Doc. 46).

"Under the [FAA], arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019). Because of this, courts must credit terms of an arbitration agreement which provide that the "arbitrator [has authority to] decide not only the merits of a particular dispute but also . . . 'whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc.*, 586 U.S. at 67–68 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). An arbitration agreement may delegate the decision of whether a dispute falls within the scope of an agreement, but "the delegation must be 'clear and unmistakable.'" *HealthplanCRM, LLC*, 458 F. Supp. 3d at 322 (quoting *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014)). This is accomplished

---

[3] Because the Court finds the browsewrap agreement itself provided notice of the Arbitration Provision, the Court need not address the parties' arguments regarding whether Swartz received additional notice of the Arbitration Provision. (Doc. 44, at 24-27; Doc. 46, at 21-27).

through contractual language which reflects an "'express' and 'unambiguous' expression of intent to arbitrate arbitrability." *HealthplanCRM, LLC*, 458 F. Supp. 3d at 322.

Here, the Arbitration Provision states:

You and Disney+ and/or ESPN+ empower the arbitrator with the exclusive authority to resolve any dispute relating to the interpretation, applicability or enforceability of these terms or the formation of this contract, including, without limitation the arbitrability of any dispute, and any claim that all or any part of this Agreement are void or voidable.

(Doc. 45-11, at 11).

Courts have found similar contractual language sufficient to delegate the issue of arbitrability to the arbitrator. *See Davis v. Uber Techs., Inc.*, No. CV 16-6122, 2017 WL 3167807, at *3 (E.D. Pa. July 25, 2017) (finding language stating "[s]uch disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator" delegated questions like arbitrability to the arbitrator); *see also Jean v. Bucknell Univ.*, No. 4:20-CV-01722, 2021 WL 1521724, at *5 (M.D. Pa. Apr. 16, 2021), *dismissed*, No. 21-1964, 2022 WL 22858206 (3d Cir. Apr. 22, 2022) (finding language "expressly stating that issues regarding the validity or enforceability of an arbitration agreement shall be determined by an arbitrator is likely sufficient" to delegate questions like arbitrability to the arbitrator). Thus, the Court must refrain from addressing whether this matter falls within the scope of the arbitration agreement and leave that question to the arbitrator. *See Henry Schein, Inc.*, 586 U.S. at 67–68. Accordingly, the Court **GRANTS** ESPN's renewed motion to compel arbitration (Doc. 43) and **STAYS** this case pending arbitration.

21

## IV.    CONCLUSION

For the foregoing reasons, ESPN's renewed motion to compel arbitration (Doc. 43) is

**GRANTED** and this case is **STAYED** pending arbitration.

An appropriate Order follows.


                                                    **BY THE COURT:**


Dated: May 29, 2026                    *s/ Karoline Mehalchick*
                                       **KAROLINE MEHALCHICK**
                                       **United States District Judge**